## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **SCOTT CHEEVER and SIDNEY GLEASON,** | |
| **Plaintiffs,** | |
| **v.** | **Case No. 20-2555-JAR-KGG** |
| **JEFFREY ZMUDA, Secretary of Corrections, et al.,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiffs Scott Cheever and Sidney Gleason bring this action challenging a Kansas Department of Corrections ("KDOC") policy that automatically and permanently holds death-sentenced inmates in solitary confinement until either their capital sentence is overturned or they die. Plaintiffs name as Defendants their prison wardens, Sam Cline and Shannon Meyer, and Secretary of the KDOC, Jeffrey Zmuda. Before the Court is Defendants' Motion to Dismiss and in the Alternative for Summary Judgment (Doc. 11). Defendants move to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6), or in the alternative, for summary judgment under Fed. R. Civ. P. 56. Plaintiffs' response invokes Rule 56(d); they assert that without discovery they cannot meaningfully respond to Defendants' statement of facts. As described more fully below, the Court grants Defendants' motion to dismiss for lack of subject matter jurisdiction under the doctrine of mootness and denies Plaintiffs' request for discovery.

### I.      Standard

Defendants move to dismiss in part under the doctrine of mootness, arguing that the challenged KDOC policy was revised after the Complaint was filed so that death-sentenced

inmates are no longer automatically and permanently held in solitary confinement with no opportunity for review.  Because the Court lacks subject matter jurisdiction over claims that are moot,[1] Rule 12(b)(1) applies to this part of Defendant's motion.[2]  Federal courts are courts of limited jurisdiction and, as such, there is a strong presumption against federal jurisdiction.[3]  "A court lacking jurisdiction . . . must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking."[4]  Under Rule 12(b)(1), requests for dismissal for lack of subject matter jurisdiction come in two forms: facial attacks and factual attacks.[5]  A facial attack challenges the sufficiency of the complaint.[6]  A factual attack relies on evidence outside the complaint to challenge jurisdiction.[7]

Here, Defendants mount a factual attack to the Court's jurisdiction, attaching declarations and the new policy in support of their mootness challenge.  The Court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts."[8]  The Court considers the documents attached to Defendants' motion to dismiss.  There is no need for an evidentiary hearing because the documents required to resolve

---

[1] *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010) (citation omitted).

[2] Defendants seek dismissal based on both constitutional and prudential mootness.  Constitutional mootness is jurisdictional and prudential mootness is discretionary.  *Brown v. Buhman*, 822 F.3d 1151, 1165 n.15 (10th Cir. 2016) (citations omitted).  The Court does not address prudential mootness since it finds that Plaintiffs' claims are constitutionally moot.

[3] *Penteco Corp. v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991); *see also United States v. Hardage*, 58 F.3d 569, 574 (10th Cir. 1995) ("Federal courts have limited jurisdiction, and they are not omnipotent. They draw their jurisdiction from the powers specifically granted by Congress, and the Constitution, Article III, Section 2, Clause 1." (citations omitted)).

[4] *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015) (quoting *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013)).

[5] *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020).

[6] *Id.* (citing *Pueblo of Jemez*, 790 F.3d at 1148 n.4).

[7] *Id.* (citing *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995)).

[8] *Id.* (quoting *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001)).

this dispute are limited to mostly public documents, as well as declarations by two prison officials about implementation of the new policy. Considering these documents does not convert the motion into one for summary judgment because resolution of the jurisdictional question is not intertwined with the merits—the question before the Court is whether a new KDOC policy implemented after the Complaint was filed renders moot Plaintiffs' claims for relief in this case.[9] Plaintiffs fail to identify any specific discovery required to rebut the mootness challenge. Because the Court does not convert Defendants' motion into one for summary judgment, it need not resolve Plaintiffs' request under Rule 56(d) for additional discovery in order to respond to the motion.[10]

## II.    Factual Background

On November 6, 2020, Plaintiffs Scott Cheever and Sidney Gleason filed the instant Complaint. At that time, Internal Management Policy and Procedure ("IMPP") 20-104 I.B.16 governed KDOC placement of death-sentenced inmates. Under this provision, an inmate who was sentenced to death after conviction for a capital offense was placed in solitary confinement (called "administrative segregation") automatically. Under that IMPP, such inmates were "not . . . subject to the periodic Program Management Committee reviews required within the provisions of IMPP 20-106 unless there [was] some departure from their capital status."[11]

---

[9] *See id.* (citation omitted).

[10] Even if the Court considered Plaintiffs' request in the context of Rule 56(d), it would fail. Under that rule, the moving party must explain by affidavit: (1) why facts precluding summary judgment are unavailable; (2) what probable facts it can find through further discovery; (3) what steps it has taken to obtain such facts; and (4) how additional time will allow it to controvert facts. *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000) (citation omitted). "A party may not invoke Rule 56[d] 'by simply stating that discovery is incomplete but must state with specificity how the additional material will rebut the summary judgment motion.'" *Garcia v. U.S. Air Force*, 533 F.3d 1171, 1179 (10th Cir. 2008) (quoting *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1308–09 (10th Cir. 2007)). The affidavit submitted in support of Plaintiffs' request does not meet these requirements.

[11] Doc. 1 ¶ 2.

Regardless of their behavior, death-sentenced inmates like Plaintiffs could not obtain review of or challenge their administrative segregation under this provision—administrative segregation could end only if their death sentence was overturned.

Plaintiffs plead that KDOC policy and procedure denies death-sentenced inmates such as Plaintiffs meaningful human contact for years on end, and that Plaintiffs each have been denied such contact for over a decade. Plaintiffs allege that the KDOC's policy and procedure that places death-sentenced inmates in automatic and indefinite administrative segregation "is extreme, debilitating, and inhumane, violates contemporary standards of decency, and poses an unreasonable risk of serious harm to the health and safety of Plaintiffs."[12]

Plaintiff Cheever was sentenced to death in January 2008. The KDOC placed Cheever in administrative segregation at Lansing Correctional Facility ("LCF"), where he has remained for more than a dozen years. Plaintiff Gleason was sentenced to death in August 2006. The KDOC placed Gleason in administrative segregation at El Dorado Correctional Facility ("EDCF"), where he has remained for over 14 years.

Plaintiffs allege two counts in this action under 42 U.S.C. § 1983: (1) violation of the Eighth and Fourteenth Amendments on the basis of cruel and unusual punishment; and (2) violation of due process under the Fourteenth Amendment. Count One challenges the KDOC's "automatic and permanent placement of Plaintiffs in solitary confinement," which subjected them to a substantial risk of serious harm.[13] Count Two challenges the denial of "any review of their placement in solitary confinement and . . . no possibility of relief from that isolation."[14] Plaintiffs pray for judgment:

---

[12] *Id.* ¶ 3.

[13] *Id.* ¶ 28.

[14] *Id.* ¶ 39.

A.      Declaring that Defendants' policies and procedures that automatically place all death-sentenced inmates in permanent solitary confinement with no opportunity for review violate the Eighth and Fourteenth Amendments to the United States Constitution;

B.      Granting permanent injunctive relief against Defendants to comply with the Eighth and Fourteenth Amendments to the United States Constitution by enjoining them and their successors, agents, representatives, or others acting in concert with them or on their behalf, from confining Plaintiffs in permanent solitary confinement with no opportunity for review, and to abolish the policies and procedures that do so;

C.      Granting permanent injunctive relief requiring Defendants to present a plan to the Court within 45 days that provides for:

1.      the institution of a meaningful individualized placement procedure for death-sentenced inmates such as Plaintiffs that is based on validated risk assessment instruments and the prisoner's individual circumstances; is not arbitrary; and allows death-sentenced inmates the opportunity to qualify for the same placements as those inmates who were not death-sentenced, including placement in either (a) a general population unit, or (b) a modified general population unit in which the death-sentenced inmates remain segregated from the general prison population but have the same privileges as inmates in the general population;

2.      application of the new placement procedure described above to Kansas' current population of death-sentenced inmates and any such inmates in the future;

3.      alleviation of the conditions of confinement of all death-sentenced inmates so they are no longer incarcerated under condition of isolation, sensory deprivation, and lack of social and physical human contact; and

4.      any other measure required to bring Defendants into compliance with the Eighth and Fourteenth Amendments to the United States Constitution.

D.      Maintaining jurisdiction over this action to ensure Defendants' full compliance with the injunction;

E.      Awarding Plaintiffs their costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988; and

F.      Granting such other and further relief as the Court deems just and proper.[15]

In 2019, the KDOC began to consider changes to its management and housing of death-sentenced inmates.  As part of this process, the KDOC reviewed other states' practices and solicited input from attorneys with the Kansas Capital Defense Project.  The KDOC implemented some changes to the old policy, including the addition of outside and inside recreation time, walking in a meal line, phones in cells, extended in-person legal visits and extra legal boxes, more leniency with property, kiosks for video visits, and media tablets.  The process slowed due to issues caused by the COVID-19 pandemic, but, on January 20, 2021, the KDOC adopted a  Policy Memorandum to IMPP 12-136A, formally implementing changes to the management of death-sentenced inmates.

The Policy Memorandum to IMPP 12-136A supersedes "[a]ll previous policies, procedures or practices related specifically to long term administrative segregation of CP residents," including IMPP 20-104 I.B.16.[16]  It provides: "All newly admitted residents convicted of a capital offense after the date of this Policy Memorandum will not be placed in administrative segregation based solely on that conviction."[17]  It also provides that "[a] multidisciplinary team ["MDT"] will be convened to review each [death-sentenced] resident's classification/housing status," and that such team "will include representatives from the Unit Team, Classification Administrator, Legal, Security, Behavioral Health, Health Services, and Deputy Wardens."[18]  The Policy Memorandum outlines a four-step review process "with the

---

[15] *Id.* at 13–14.

[16] Doc. 12-5 ¶ 6 & Ex. 1 at 1.

[17] Doc. 12-5, Ex. 1 at 1.

[18] *Id.*

ultimate goal of housing [death-sentenced] residents in general population."[19]  At each step of the process, if a death-sentenced inmate "does not qualify to move to the next step . . . based on his current behavior or other circumstances, the MDT will conduct 30-day reviews until each . . . inmate has been transitioned into general population."[20]

Defendant Jeffrey Zmuda, Secretary of the KDOC, asserts in his declaration that "[t]he KDOC is committed to continuing to implement the Policy Memorandum, including the transition and review procedures described in the attachment to this declaration."[21]  According to Joel Hrabe, the Deputy Secretary of Facility Management for the KDOC, the KDOC "pushed forward to finalize the new management and housing practices for [death-sentenced] residents in November 2020 by implementing the multidisciplinary team provided for in the Policy Memorandum."[22]  According to Hrabe, Cheever and Gleason do not meet the criteria to begin the Step 1 transition—participation in outside and inside recreation collectively with other death-sentenced residents—due to their disciplinary history.[23]  Three other death-sentenced inmates have begun the first step of transitioning into the general population.

## III.   Discussion

Article III of the Constitution gives federal courts the power to exercise jurisdiction only over "Cases" and "Controversies."  As the Supreme Court has explained:

> In limiting the judicial power to "Cases" and "Controversies,"
> Article III of the Constitution restricts it to the traditional role of
> Anglo-American courts, which is to redress or prevent actual or
> imminently threatened injury to persons caused by private or
> official violation of law.  Except when necessary in the execution

---

[19] Doc. 12-5 ¶ 9.

[20] *Id.*

[21] *Id.* ¶ 11.

[22] Doc. 12-4 ¶ 8.

[23] *Id.* ¶ 6.

of that function, courts have no charter to review and revise legislative and executive action.[24]

One of several doctrines reflecting Article III's case-or-controversy limitation on the judicial power is the doctrine of standing.  That doctrine requires federal courts, before considering the merits of an action, to "satisfy themselves that 'the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant [the plaintiff's] invocation of federal-court jurisdiction.'"[25]  Standing considers whether there is a case or controversy at the time the action is filed, while "mootness ensures it remains one at the time a court renders a decision."[26]  "Failure to satisfy the requirements of either doctrine places a dispute outside the reach of the federal courts."[27]

If events subsequent to the filing of the case resolve the dispute, the federal court must dismiss it as moot.[28]  "In deciding whether a case is moot, '[t]he crucial question is whether granting a present determination of the issues offered . . . will have some effect in the real world.'"[29]  In other words, "a case becomes moot 'when a plaintiff no longer suffers "actual injury that can be redressed by a favorable judicial decision."'"[30]  Defendant bears the burden of demonstrating mootness.[31]

---

[24] *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).

[25] *Id.* at 493 (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

[26] *Brown v. Buhman*, 822 F.3d 1151, 1163 (10th Cir. 2016).

[27] *Id.* at 1164 (citing *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013)).

[28] *Unified Sch. Dist. No. 259 v. Disability Rights Ctr.*, 491 F.3d 1143, 1147 (10th Cir. 2007).

[29] *Kan. Jud. Rev. v. Stout*, 562 F.3d 1240, 1246 (10th Cir. 2009) (alteration in original) (quoting *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000)).

[30] *Ghailani v. Sessions*, 859 F.3d 1295, 1301 (10th Cir. 2017) (quoting *Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015)); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021).

[31] *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1183 (10th Cir. 2012) (citation omitted).

One exception to the mootness doctrine is the voluntary cessation exception, which provides that "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued."[32]  The exception "exists to counteract the possibility of a defendant ceasing illegal action long enough to render a lawsuit moot and then resuming the illegal conduct."[33] However, a court may nonetheless conclude that voluntary cessation has rendered a case moot if "there is no reasonable expectation that the alleged violation will recur" and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."[34] Moreover, "[v]oluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction."[35]  The party asserting mootness bears the "heavy burden" of demonstrating "that there is no reasonable expectation that the wrong will be repeated."[36]

## A.    Relief Sought

Defendants argue that the KDOC's January 20, 2021 Policy Memorandum moots the case because it supersedes the challenged KDOC policy of automatic and permanent placement of death-sentenced inmates in administrative segregation with no opportunity for review. Because Plaintiffs' claims are based on the old policy, Defendants contend that a favorable judicial decision would have no effect in the real world.  The Court agrees that the policy challenged by Plaintiffs' Complaint has been superseded by the January 20, 2021 Policy

---

[32] *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)); *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 880 (10th Cir. 2019) (citation omitted).

[33] *Ind*, 801 F.3d at 1214 (quoting *Chihuahuan Grasslands All. v. Kempthorne*, 545 F.3d 884, 892 (10th Cir. 2008)).

[34] *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1115 (10th Cir. 2010) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).

[35] *Ind*, 801 F.3d at 1214 (alteration in original) (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1115).

[36] *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

Memorandum.  However, "[t]he court must decide whether a case is moot as to 'each form of relief sought.'"[37]  The Court therefore proceeds to consider each form of relief sought by Plaintiffs in the Complaint and finds that each is moot.

### 1.    Declaratory Relief

Plaintiffs seek a declaratory judgment that Defendants' policies and procedures that automatically place all death-sentenced inmates in permanent solitary confinement with no opportunity for review violate the Eighth and Fourteenth Amendments.  Declaratory judgment actions "must comport with the same mootness principles as any other suit."[38]  A declaratory judgment claim that "does not 'settl[e] . . . some dispute which affects the behavior of the defendant toward the plaintiff' is moot because it fails to 'seek[] more than a retrospective opinion that [the plaintiff] was wrongly harmed by the defendant.'"[39]  In this case, the requested declaratory judgment would seek only a retrospective opinion about a superseded policy and procedure.  The KDOC no longer automatically and permanently places all death-sentenced inmates in permanent administrative segregation without opportunity for review.  Plaintiffs' request for declaratory relief is thus moot.

### 2.    Injunctive Relief

"Generally, a claim for prospective injunction becomes moot once the event to be enjoined has come and gone."[40]  In considering injunctive relief, the plaintiff's "susceptibility to *continuing* injury is of particular importance—'[p]ast exposure to illegal conduct does not in

---

[37] *Prison Legal News*, 944 F.3d at 880 (quoting *Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019)).

[38] *Prier v. Steed*, 456 F.3d 1209, 1213 (10th Cir. 2006) (citations omitted).

[39] *Prison Legal News*, 944 F.3d at 868 (alterations and omission in original) (first quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1110 (10th Cir. 2010), and then quoting *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011)).

[40] *Id.* (quoting *Citizen Ctr. v. Gessler*, 770 F.3d 900, 907 (10th Cir. 2014)).

itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'"[41]   The plaintiff's susceptibility to injury must be reasonably certain.[42]

Here, Plaintiffs seek two injunctions.  First, Plaintiffs ask that Defendants be enjoined from permanently confining Plaintiffs in administrative segregation with no opportunity for review, and be required to abolish any policies and procedures that provide otherwise.  The policies and procedures that allowed permanent confinement in administrative segregation with no opportunity for review have been superseded by the 2021 Policy Memorandum; therefore, the event to be enjoined has come and gone.  Although Plaintiffs do not presently meet the requirements to begin the step one transition, the policy mandates that this decision be reviewed every 30 days by the MDT.  Therefore, Plaintiffs' first request for injunctive relief is moot.

Second, Plaintiffs ask that Defendants be required to present to the Court a plan that (1) provides for a "meaningful individualized placement procedure" for death-sentenced inmates; (2) applies such procedure to both the current population and new inmates; (3) calls for alleviation of certain conditions of confinement for all death-sentenced inmates, including "isolation, sensory deprivation, and lack of social and physical human contact"; and (4) "any other measure required to bring Defendants into compliance with the Eighth and Fourteenth Amendments."[43] The event to be enjoined has come and gone with respect to Plaintiffs' requested plan because the Policy Memorandum provides for an individualized placement procedure that includes 30-day reviews at any step if an inmate is deemed not to qualify for transition, and it explicitly

---

[41] *Jordan*, 654 F.3d at 1024 (alterations and omission in original) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

[42] *Id.* (first citing *O'Shea*, 414 U.S. at 497; and then citing *Rizzo v. Goode*, 423 U.S. 362, 372 (1976)).

[43] Doc. 1 at 14.

applies to both current and new death-sentenced inmates.  An injunction requiring Defendants to devise a plan for individualized review is clearly mooted by the new policy.

The requested plan also asks that Defendants take steps to alleviate certain conditions of confinement in administrative segregation.  The new policy does not prohibit administrative segregation; it requires MDT review before an inmate is placed in administrative segregation and every 30 days thereafter.  This procedure is in line with the policy acknowledged in Plaintiffs' Complaint for inmates who are not sentenced to death—when those inmates are placed in administrative segregation, "they are not permanently assigned to solitary confinement and are expected to return to the general population.  Indeed, KDOC policy and procedure contemplates regular review of all or substantially all solitary confinement placements except for death-sentenced inmates."[44]  Plaintiffs further allege that "[c]orrections officials in other states use placement systems based on several objective factors, such as age and prison disciplinary history, because such factors, unlike the inmate's sentence, are predictive of potential security concerns."[45]

Plaintiffs' § 1983 claims do not target the KDOC's policy of administrative segregation, they target the policy of permanent and automatic administrative segregation with no opportunity for review.  The 2021 Policy Memorandum constitutes a plan that includes a comprehensive placement system for death-sentenced inmates, similar to the approach cited in the Complaint that applies to placement decisions for non-capital inmates, and to the approach taken by other states.  The new policy takes a variety of relevant factors into account when making transition decisions for these inmates, including disciplinary history.  Therefore, the event to be enjoined

---

[44] *Id.* ¶ 6.

[45] *Id.* ¶ 11.

has come and gone.  Moreover, Plaintiffs fail to demonstrate that they are susceptible to an ongoing injury.  Plaintiffs' past injury is not the relevant inquiry on mootness, and they fail to show that a future injury based on automatic, permanent placement in administrative segregation is reasonably certain.  Plaintiffs' second requested injunction is therefore moot.

### B.      Voluntary Cessation

Plaintiffs maintain that the voluntary cessation exception to mootness applies because the change in policy happened only after the Complaint was filed, and there is no assurance that it will be implemented by a date certain.  The Court must therefore determine if there is no reasonable expectation that the alleged violation will recur, and whether the new policy "completely and irrevocably eradicated the effects of the alleged violation."[46]

Here, the KDOC did not make a mere informal change to the challenged policy.  The KDOC superseded the challenged policy in the January 20, 2021 Policy Memorandum.  This was a concrete change in policy that helps ensure past violations will not recur.[47]  And according to the Zmuda Declaration, the KDOC is committed to implementing the transition and review procedures set forth in the Policy Memorandum.  The KDOC officials named as Defendants may be tasked with implementing these policies, but the MDT reviews each inmate's classification and housing status to determine if transition is warranted at each of the four steps set forth in the memorandum.  The Hrabe Declaration establishes that the MDT was established in November 2020, and three capital defendants have already started the transition process.  The Court finds that the KDOC's policy change was not merely an "informal promise or assurance," or statement

---

[46] *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1115 (10th Cir. 2010) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).

[47] *See Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 883–84 (10th Cir. 2019); *Rio Grande Silvery Minnow*, 601 F.3d at 1118.

of intention.[48]  The Policy Memorandum displaced the previous policy of automatic, permanent administrative segregation with no opportunity for review, and there is no indication in the record that the KDOC intends to resume its previous policy if the case is dismissed.  As such, they new policy "foreclose[s] a reasonable chance of recurrence of the challenged conduct."[49]

While Plaintiffs are correct that Defendants carry a heavy burden of showing that the voluntary cessation exception does not apply, they have met that burden here.  Defendants need not establish that there is "'no possibility' of recurrence—only that its challenged actions could not reasonably be expected to recur."[50]  Here, the KDOC's actions in superseding the challenged policy satisfy Defendants' heavy burden to show that its challenged actions could not reasonably be expected to recur.

Plaintiffs complain that the Policy Memorandum contains no timeline for the four-step transition protocol.  They urge that jurisdictional discovery is necessary to determine what the new review process entails, and whether it in fact changes the prior policy of permanent administrative segregation.  The Court disagrees.  The Complaint specifically targets the KDOC policy outlined in IMPP 20-104 I.B.16, a policy that provided no review process and triggered automatic, permanent placement in administrative segregation.  Defendants submit clear evidence that the challenged policy has been superseded, and that the goal is to transition these inmates into the general population and provide 30-day reviews by an MDT for any inmate who does not qualify for transition at any of the four steps.

---

[48] *See Prison Legal News*, 944 F.3d at 884 (alterations omitted) (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1118).

[49] *See Tandy v. City of Wichita*, 380 F.3d 1277, 1291 (10th Cir. 2004) (citation omitted).

[50] *See Prison Legal News*, 944 F.3d at 884 (citation omitted).

The Policy Memorandum sets forth the new review and transition policy, and although it does not contain an implementation deadline, it does state that it applies to newly admitted capital residents after the date of the policy, January 20, 2021.  Hrabe's Declaration states that, as early as 2019, the KDOC was implementing some changes to the old policy, including outside and inside recreation time, walking in a meal line, phones in cells, extended in-person legal visits and extra legal boxes, more leniency with property, kiosks for video visits, and media tablets. Three death-sentenced inmates were identified as meeting criteria to begin the first transition into the general population.  While this process slowed during the pandemic, the policy was finalized in January 2021.  The MDT was established in November 2020.  This evidence all points to "'genuine' government self-correction that courts accord solicitude."[51]  Plaintiffs fail to identify what additional discovery they expect would rebut this evidence; they are hard pressed to do so given the formal policy change.  There is no indication that the KDOC is attempting "to evade judicial review, or to defeat a judgment, by *temporarily* altering questionable behavior."[52]

Plaintiffs contend that the new policy does not go far enough to alleviate the problems identified in the Complaint, and that it does not provide a framework of meaningful criteria by which the MDT will make its decisions.  But the policy addresses the three core complaints in Plaintiffs' case: permanent, automatic placement in administrative segregation, and no opportunity for review.  The policy does set forth decision criteria, which it delegates to an MDT comprised of representatives from the Unit Team, Classification Administrator, Legal, Security, Behavioral Health, Health Services, and Deputy Wardens.  At each step of review, the MDT is to consider, "among any other relevant factors, the CP resident's disciplinary history, central

---

[51] *Id.* (quoting *Brown v. Buhman*, 822 F.3d 1151, 1168 (10th Cir. 2016)).

[52] *Brown*, 822 F.3d at 1171 (citation omitted).

monitoring status, mental and physical health."[53]  Again, there is no indication that the KDOC

will not follow this procedure.  Zmuda states that the KDOC intends to follow this policy with

the ultimate goal of moving each death-sentenced inmate into the general population.  In sum,

the new policy language makes clear that it changes the practice of automatic, permanent

administrative segregation with no opportunity for review challenged by Plaintiffs in this case.

Coupled with the KDOC officials' declarations, Defendants have met their heavy burden of

demonstrating that the voluntary cessation exception to mootness does not apply.  Accordingly,

this Court lacks jurisdiction because there is no longer a live case or controversy.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to

Dismiss (Doc. 11) is **granted**; the alternative Motion for Summary Judgment (Doc. 11) is **moot**.

This case is dismissed without prejudice for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

Dated: May 10, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

---

[53] Doc. 12-5, Ex. 1 at 2.